IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

**ROBERT NIXON,**

*Plaintiff,*

**v.**

**ANCHOR GLASS CONTAINER CORPORATION,**

*Defendant.*

**CIVIL ACTION NO.**
**5:23-cv-00362-TES**

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Nixon began working for Defendant Anchor Glass Container Corporation's Warner Robins plant in July 1987. [Doc. 23-1, ¶ 16].[1] Plaintiff reached the position of Journeyman Machine Repairman. [*Id.*]. Along with his typical work duties, Plaintiff also held positions within the workers' Union, including a term as Union president that ended May 2021. [*Id.* at ¶ 18].

Between 1987, and his eventual separation from Anchor Glass, Plaintiff racked up quite the attendance record.[2] To set the scene, just in the last ten years, Plaintiff

[1] The Court primarily cites to Plaintiff's Response to Anchor Glass's Statement of Undisputed Material Facts, as that filing outlines the facts as both parties see them—*i.e.*, it includes Anchor Glass's factual propositions along with Plaintiff's responses. *See* [Doc. 23-1].

[2] Anchor Glass enforces an Attendance Control Program ("ACP"), which assigns points to absences and correlates disciplinary action based on the number of points an employee accrues. [Doc. 23-1, ¶¶ 5–7]. Upon reaching 10 ACP points, an employee is suspended pending termination. [*Id.* at ¶ 6].

received the following warnings:

- *October 2016*: Final Written Warning for seven absences between October 16, 2015, and October 16, 2016 [*Id.* at ¶ 19];

- *April 2017*: Final Written Warning for seven absences between June 22, 2016, and April 3, 2017 [*Id.* at ¶ 20];

- *July 2017*: Final Written Warning for seven absences between July 13, 2016, and June 29, 2017 [*Id.* at ¶ 21];

- *October 2017*: Final Written Warning for seven absences between October 14, 2016, and October 5, 2017 [*Id.* at ¶ 22];

- *June 2018*: Final Written Warning for seven absences between June 29, 2017, and June 12, 2018 [*Id.* at ¶ 23];

- *March 2019*: Final Written Warning for seven absences between April 10, 2018, and March 10, 2019 [*Id.* at ¶ 24];

- *May 2019*: Final Written Warning for seven absences between May 15, 2018, and April 28, 2019 [*Id.* at ¶ 25];

- *December 4, 2019*: 1st Written Warning for three absences between September 16, 2019, and December 3, 2019 [*Id.* at ¶ 26];

- *May 18, 2020*: 2nd Written Warning for six absences and a tardy between September 16, 2019, and May 15, 2020 [*Id.* at ¶ 27]; and

- *February 22, 2021*: 3rd Written Warning for nine absences and a tardy between April 15, 2020, and February 19, 2021 [*Id.* at ¶ 28].[3]

By the Court's math, that list adds up to 67 absences and a couple of tardies.

Based on this evidence, Plaintiff simply wasn't an ideal (or reliably present) employee,

[3] Even after securing leave, Plaintiff continued to collect warnings for days missed prior to requesting FMLA leave. Namely, Anchor Glass issued Plaintiff a 2nd written warning on August 2, 2021, for five absences and two tardies between December 1, 2020, and July 31, 2021. [*Id.* at ¶ 45].

but, he had managed to stay in the Defendant's employ for more than 30 years. That brings us to February 22, 2021, when Plaintiff applied to take FMLA leave to care for his wife due to her medical condition. [*Id.* at ¶ 29]. Prudential—who maintains Anchor Glass's FMLA policies as a third-party administrator, [*Id.* at ¶ 8]—sent Plaintiff a letter requesting he provide supporting documentation for the proposed leave by March 10, 2021. [*Id.* at ¶ 30]. Plaintiff provided a Certification of Health Care Provider for Family Member's Serious Health Condition form completed by his wife's medical provider. [*Id.* at ¶ 31]. That Certification showed that Plaintiff required intermittent leave up to four times per month for eight hours at a time (inclusive of travel time for appointments, etc.), from January 1, 2021, through January 1, 2022. [*Id.* at ¶ 32].

On March 15, 2021, Prudential approved Plaintiff's intermittent leave request[4] from February 18, 2021, through February 22, 2021. [*Id.* at ¶ 33]. Later, on March 25, 2021, Prudential informed Plaintiff via letter that it approved his request to take intermittent leave between March 22, 2021, and September 22, 2021, up to four times per month for one day at a time. [*Id.* at ¶ 34]. Pursuant to his approval, Prudential also granted Plaintiff's request to take leave on April 16, 2021, April 20 through 26, 2021, and May 10, 2021. [*Id.* at ¶ 36].

Plaintiff then requested to take FMLA leave from June 28, 2021, through July 4, 2021, and July 6, 2021, through July 9, 2021. [*Id.* at ¶ 37]. This time, Prudential sent

[4] Any reference to "leave requests" or "leave" throughout this Order refers to FMLA leave.

Plaintiff a letter informing him that his request "had not yet been approved" because he "had not provided a certification." [*Id.*]. Along with the letter, Plaintiff also received email notifications that Prudential posted a new letter to his online account. [*Id.* at ¶¶ 39–40]. Then, on July 16, 2021, Prudential alerted Plaintiff that it denied his leave request, and that further details could be found on his portal. [*Id.* at ¶ 44].

Plaintiff later requested leave on August 14, 2021, but Prudential notified him that the request "exceeded the approved frequency and duration of four times per month one day at a time." [*Id.* at ¶ 46]. Then, Prudential told Plaintiff he needed to complete and submit a new certification no later than September 3, 2021, or his absences may not be approved. [*Id.* at ¶ 47].

Once again, Prudential informed Plaintiff via letter that his absences on August 14, 24, and 28–29, 2021, were not approved since they exceeded his allotted duration. [*Id.* at ¶ 49]. Following this, Anchor Glass's HR representative—Charlotte Elliott, *see* [*id.* at ¶ 14]—informed Plaintiff that Prudential denied Plaintiff's absences on August 14, 24, and 28–29, 2021, and that he had accrued 10.5 absences, which meant he would be suspended. [*Id.* at ¶¶ 51-52].

On September 20, 2021, Anchor Glass issued Plaintiff a 4th Written Warning for nine absences and three tardies between December 1, 2020, and September 17, 2021. [*Id.* at ¶ 54]. Plaintiff contacted Elliott to alert her that Prudential approved a day listed as one of his unauthorized absences—July 31, 2021. [*Id.* at ¶ 55]. Elliott verified Plaintiff's

contention, but while confirming the July 31 absence, Elliott discovered Plaintiff "had more absences that had not been approved by Prudential." [*Id.* at ¶ 57]. Subsequently, Anchor Glass issued Plaintiff another written warning for 19.5 absences between December 1, 2020, and September 17, 2021—not including the July 31 absence—and suspended Plaintiff pending termination. [*Id.* at ¶ 58].

On September 28, 2021—*after* Anchor Glass notified him that he exceeded the permitted absences under the ACP—Plaintiff supplied Prudential with a Certification completed by his wife's medical provider. [*Id.* at ¶ 59]. That Certification "indicated that Plaintiff would require intermittent leave up to three times per week for eight hours at a time, inclusive of travel time for appointments, from February 1, 2021, through February 1, 2022." [*Id.* at ¶ 60]. The new Certification included "sixteen dates from June 27, 2021, through August 29, 2021, that Plaintiff was absent for his spouse's treatments, recovery, flare-ups, or travel time due to the medical condition." [*Id.* at ¶ 61]. After receiving this Certification, Prudential approved Plaintiff's request for "three times per week for eight hours at a time from September 23, 2021, through February 1, 2022." [*Id.* at ¶ 62].

On October 5, 2021, Prudential alerted Anchor Glass that it denied 14 absences between June 27, 2021, and August 28, 2021, because Plaintiff failed to provide timely medical information. [*Id.* at ¶ 65]. Prudential also informed Anchor Glass that Plaintiff did provide the necessary information after the denial date, and asked Anchor Glass if

it wanted to overturn the previously denied absences. [*Id.* at ¶ 66]. Jeff Gordon—Anchor Glass's HR director, *see* [*id.* at ¶ 14]—declined to overturn the previous absences. [*Id.* at ¶ 67].

Then, on October 13, 2021, Plaintiff met with Anchor Glass to discuss his suspension pending termination. [*Id.* at ¶ 70]. Following the meeting, Gordon sent Plaintiff a letter dated October 15, 2021, "notifying him that Anchor [Glass] had terminated his employment for violation of the attendance policy because Plaintiff had failed to timely report FMLA absences to Prudential." [*Id.* at ¶ 70]. Plaintiff admitted that he "failed to provide timely documentation to Prudential and that was the reason for his termination." [*Id.* at ¶ 71].

Following the termination, Plaintiff filed a grievance, which led to Anchor Glass permitting him to return to work under a Last Chance Agreement ("LCA"). [*Id.* at ¶¶ 73, 75].[5] The LCA "provided that Plaintiff was permitted zero attendance issues during the first six-month period, from November 30, 2021, through May 30, 2022." [*Id.* at ¶ 76]. The LCA also "stated that 'Plant shutdowns, Layoffs of any kind, Holidays, Vacations, Medical Leave, Family Medical Leave, or Personal Leave will be considered "dead time" and will extend your probation proportionately.'" [*Id.* at ¶ 77].

Once Plaintiff returned to work at Anchor Glass, he reinstated his FMLA leave

[5] Plaintiff began working for another company following his termination, so he asked Anchor Glass to give him a delayed return-to-work date so that he could inform his new employer. [*Id.* at ¶ 74].

through Prudential. [*Id.* at ¶ 78]. Following his submission of medical documentation, Prudential "approved for him to take intermittent leave up to four times per month up for one day at a time from December 15, 2021, through June 15, 2022." [*Id.* at ¶ 81]. Then, regarding a requested absence for April 29, 2022, Prudential notified Plaintiff that his request was pending "because he had not provided a certification and it exceeded the approved frequency and duration of leave." [*Id.* at ¶ 82]. On April 5, 2022, "Prudential sent Plaintiff a letter approving his request to take intermittent leave from April 1, 2022, through October 1, 2022, up to six times per month for eight hours at a time." [*Id.* at ¶ 83].

During the nearly six-month period between December 1, 2021, and May 27, 2022, Plaintiff took "a total of forty days off of work for FMLA leave, holidays, and vacation," so the LCA's application period also extended by 40 days. [*Id.* at ¶¶ 84–85]. That leads us to May 12, 2022, when Plaintiff called out at 5:43 a.m.—17 minutes before his shift began at 6:00 a.m. [*Id.* at ¶ 86]. In response, Anchor Glass suspended Plaintiff pending termination for failing to provide the required one-hour notice. [*Id.* at ¶ 87]. After meeting with Plaintiff, Anchor Glass decided not to terminate his employment. [*Id.* at ¶ 88].

Then, on June 20, 2022, Plaintiff called out of work at 9:39 p.m.—21 minutes prior to his 10:00 p.m. shift—because his truck broke down. [*Id.* at ¶ 89]. Once more, Anchor Glass suspended Plaintiff pending termination for violating the LCA. [*Id.* at ¶ 90]. On

July 7, 2022, Plaintiff, Gordon, Elliott, and a union representative met to discuss the suspension. [*Id.* at ¶ 91]. After this meeting, Anchor Glass converted the suspension to a termination due to "Plaintiff's violation of the LCA." [*Id.* at ¶ 92].

Plaintiff filed a grievance regarding his termination, and on July 21, 2022, he met with Anchor Glass's representatives again. [*Id.* at ¶ 95]. Following the meeting, Gordon sent Plaintiff's Union a letter notifying him that Anchor Glass upheld the decision to terminate his employment. [*Id.* at ¶ 96]. Plaintiff's Union withdrew the grievance instead of pursuing it through arbitration. [*Id.* at ¶ 97].

That leads us to the present Complaint—where Plaintiff alleges that Anchor Glass interfered with his FMLA rights and retaliated against him for his pursuit of his FMLA leave. [Doc. 1]. To put a finer point on it, Plaintiff contends that Anchor Glass violated the FMLA when it limited his permitted leave to only "four days per month, and only for the period between March 22, 2021 and September 22, 2021." [Doc. 1, ¶ 86]. Plaintiff asserts that "his wife's medical provider had indicated that Plaintiff's need to take intermittent leave would a[t] times be unforeseeable and that this leave would be needed for the entirety of 2021." [*Id.*]. Plaintiff also argues that Anchor Glass—through Prudential—violated the FMLA by requiring him to recertify because "the intermittent leave that Plaintiff had been taking was consistent with the original certification that he had provided." [*Id.* at ¶ 89].

As to retaliation, Plaintiff contends that "had Plaintiff not taken FMLA leave,

particularly on days between June 27, 2021 and August 29, 2021," he would not have faced the initial termination and wouldn't have been placed on the LCA. [*Id.* at ¶¶ 126–128].

**LEGAL STANDARD**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[6] "When the nonmoving party has the burden of proof at trial, the moving

[6] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## DISCUSSION

Some of the Congressional purposes in enacting the FMLA were "to balance the demands of the workplace with the needs of families, to promote the stability of economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b). Under the FMLA, eligible employees are guaranteed up

"to a total of 12 workweeks of leave during any 12-month period" for several reasons. 29 U.S.C. § 2612(a)(1). This leave doesn't have to be taken all at once. It can be taken intermittently—that is, "in separate blocks of time due to a single qualifying reason." *Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 592 (11th Cir. 2017); *see also* 29 U.S.C. § 2612(b)(1).

To preserve and enforce rights guaranteed by the FMLA, the Eleventh Circuit recognizes two types of claims. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017 (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)). First, there are interference claims where an employee asserts that her employer denied or otherwise interfered with her substantive FMLA rights. *Id.*; *see also* 29 U.S.C. § 2615(a). Second, there are retaliation claims in which an employee asserts that her employer discriminated against her because she engaged in activity protected by the FMLA. *Jones*, 854 F.3d at 1267 (quoting *Strickland*, 239 F.3d at 1206); *see also* 29 U.S.C. § 2615(b); 29 C.F.R. § 825.220.

## I. Interference

"[T]o succeed on an FMLA interference claim an employee need only demonstrate by a preponderance of the evidence that []he was entitled to an FMLA benefit that was denied." *Batson v. Salvation Army*, 897 F.3d 1320, 1331 (11th Cir. 2018) (citations omitted). When it comes to an interference claim, an employee does not have to allege that his employer intended to deny a right because "the employer's motives

are irrelevant[.]" *Id.* Thus, where an employee's claim is based on his termination, just like Plaintiff's is here, "an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of [his] request for or use of FMLA leave." *Batson*, 897 F.3d at 1331; *McAlpin v. Sneads*, 61 F.4th 916, 933 (11th Cir. 2023).

At summary judgment, a claim based on interference with an FMLA right due to an employee's termination essentially merges with an FMLA retaliation claim because of the similarities in their analyses. *Batson*, 897 F.3d at 1331. The ultimate inquiry at this stage is "whether the evidence, viewed in the light most favorable to the non-moving party, establishes as a matter of law that the employer would have terminated the employee regardless of her request for or use of FMLA leave." *Id.*

On this point, Plaintiff argues that Anchor Glass illegally interfered with his FMLA rights when it terminated his employment in October 2021. [Doc. 23, p. 9]. But really, Plaintiff's entire argument rests on Anchor Glass's request for recertification, which led to the eventual October 2021 termination. [*Id.* at p. 11].

So, Plaintiff's interference claim truly comes down to one question: Did Anchor Glass—via Prudential—properly require Plaintiff to recertify his need for FMLA leave? If so, then Plaintiff's stack of dominos falls against him. If not, Anchor Glass's terminations and suspensions may violate the FMLA. Because that is the ultimate question, we start there.

*a. Recertification*

Under 29 C.F.R. § 825.308, "an employer may request a recertification of a medical condition every six months in connection with an absence by the employee." However, there are certain exceptions allowing an employer to request recertification sooner. Namely, if an employee requests an extension of leave, if the "[c]ircumstances described by the previous certification have changed significantly," or if "[t]he employer receives information that casts doubt upon the employee's stated reason for the absence or the continuing validity of the certification." 29 C.F.R. § 825.308(c)(1)–(3).

If an employer properly requests recertification, the employee must "provide the requested recertification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." *Id.* at § 825.308(d).

The relevant exception here is § 825.308(c)(2), allowing an employer to request recertification if the circumstances "have changed significantly." The regulations provide examples of significant changes, including "the duration or frequency of the absence, the nature or severity of the illness, complications." *Id.* at § 825.308(c)(2). And that is exactly what Anchor Glass argues. Indeed, Anchor Glass admits that "Prudential's June 2021 recertification request came before the minimum duration of Plaintiff's condition expired—three months after Plaintiff's March 2021 certification and

before the six-month minimum allowed under 29 C.F.R. § 825.308(b).” [Doc. 26, p. 5]. However, Anchor Glass insists that “this recertification request was reasonable because there was a significant change in the circumstances of Plaintiff’s absences.” [*Id.*].

As Anchor Glass sees it, once Plaintiff requested seven days of continuous leave from June 28, 2021, through July 4, 2021, and four days from July 6, 2021, through July 9, 2021, he exceeded the approved “leave up to four days per month in accordance with his Certification.” [*Id.*].[7] Anchor Glass—through Prudential—saw that as a “a significant change in circumstances necessitating recertification.” [*Id.*].

Anchor Glass’s position is well-rooted in case law. Indeed, numerous courts have found that employers do not “abuse the recertification requirement by asking [plaintiffs] to obtain medical recertification more than once in a one-year period.” *Andrews v. CSX Transp., Inc.*, No. 3:06-CV-704-J-32HTS, 2009 WL 5176462, at *8 (M.D. Fla. Dec. 22, 2009); *see also Parsley v. City of Columbus, Ohio Dep’t of Pub. Safety*, 471 F. Supp. 2d 858, 864 (S.D. Ohio 2006); *Norris v. Allison Transmission, Inc.*, No. 1:13-CV-01287-SEB, 2015 WL 417555, at *10 (S.D. Ind. Jan. 30, 2015) (“Thus, we hold that Allison

[7] A quick sidenote is necessary to address Plaintiff’s arguments regarding unexpected, intermittent leave versus the hard-and-fast “four days per month” as Anchor Glass read the Certification. *See generally* [Doc. 23, p. 11]. Plaintiff insists that his wife’s doctor intended for him to get intermittent leave as needed—for both expected and unexpected flare ups/appointments—instead of a rigid four-day-per-month allowance. However, the Certification is clear: the estimated four days per month covered “[b]oth[] foreseeable and unforeseeable” absences. [Doc. 20-6, p. 3]. Regardless, Anchor Glass took the correct approach. When an employee exceeds the estimated absences on a certification, an employer is entitled to seek recertification to verify the need. *See, e.g.*, *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 840 (7th Cir. 2014) (“When Hansen’s absences exceeded the frequency of the flare-ups and duration of related incapacity estimated in the certification, FMG did not seek recertification, despite its authorization do so under the circumstances.”).

did not violate the FMLA when it terminated Mr. Norris in accordance with its attendance policy, based on his failure to provide the requested medical recertification paperwork to support his need for continuous FMLA leave in April and May 2013 after providing him at least fifteen days to do so."). This is especially true when a plaintiff's use of leave exceeds the original certification. *See Holladay v. Rockwell Collins, Inc.*, 357 F. Supp. 3d 848, 866 n.13 (S.D. Iowa 2019) ("Given that the length of Plaintiff's July 18–21 absences exceeded the estimates listed in her FMLA certification . . . , the Court finds Defendant was entitled to request recertification after Plaintiff's third consecutive absence."). The Court agrees with these basic propositions and concludes that once Plaintiff's requests for leave exceeded his permitted FMLA leave under the existing Certification, Prudential properly asked for recertification based on a significant change in circumstances.

Since the Court found that Anchor Glass—via Prudential—reasonably requested recertification, the only remaining issue is whether Prudential followed the law in doing so. As outlined, once Anchor Glass requested the recertification documents, it was required to give Plaintiff 15 days to return them—"unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." 29 C.F.R. § 825.308(d).

As a reminder, Plaintiff requested to take leave from June 28, 2021, through July 4, 2021, and July 6, 2021, through July 9, 2021. [Doc. 23-1, ¶ 37]. On June 28, 2021,

Prudential sent Plaintiff a letter informing him that his request "had not yet been approved" because he "had not provided a certification." [*Id.*]. In that letter, Prudential included a recertification form that he needed to complete by July 13, 2021. [Doc. 20-8, p. 1]. That letter also informed Plaintiff that his failure to return the documentation could result in his absences not being covered by state or federal laws. [*Id.*]. Plaintiff never returned the recertification form. Then, on July 16, 2021, Prudential alerted Plaintiff that it denied his leave request, and that further details could be found on his portal. [Doc. 23-1, ¶ 44].

Once more, on August 19, 2021, Prudential sent Plaintiff a letter regarding his requested leave on August 14, 2021, stating that his request "exceeded frequency/duration" and required "recertification." [Doc. 20-10, p. 1]. Prudential alerted Plaintiff that the recertification needed to be completed by September 3, 2021, or his "absence may not be approved." [*Id.*]. And, finally, Prudential sent Plaintiff another letter on September 20, 2021, stating that it denied three absence requests since they, again, exceeded the estimated frequency and duration, and Plaintiff never recertified using the forms Prudential provided. [Doc. 20-11, p. 1].

Therefore, the Court finds that Prudential properly requested recertification, included the certification form, warned Plaintiff of the consequences if he didn't respond, and gave Plaintiff the required 15-day period to comply. *See* 29 C.F.R. §§ 825.305(d), 825.308(e). He just needed to return the form, but he didn't for whatever

reason. Indeed, there's no dispute that Plaintiff failed to provide Prudential with timely documentation. *See* [Doc. 20-2, Nixon Depo., p. 90:8–10 ("[Q:] Do you agree that you had not provided them with timely documentation? [A:] Yeah.")].

In his Response, he blames his consistent inability to return the form on "the fact he was traveling for his wife's treatment at the time, he did not receive the requests for recertification,[8] and it was otherwise not practicable under the circumstances for him to return a new certification by Defendant's requested deadline pursuant to 29 C.F.R. § 825.305(b)." [Doc. 23, p. 12 n.2]. However, that argument simply misses the mark. First, Prudential sent Plaintiff numerous emails notifying him that new information posted to his account and that he needed to view the information. *See, e.g.*, [Doc. 20-8, pp. 1, 12]; [Doc. 20-9, pp. 1, 4, 6, 8, 10, 12]; [Doc. 20-10, pp. 1, 7, 15, 18]. And Plaintiff acknowledged that he received the emails, but he "just didn't read every one of them, because a lot of them, you know, were the same thing." [Doc. 20-2, Nixon Depo., p. 64:1–3]; *see also* [*id.* at p. 64:4–7 ("[Q:] You don't dispute that you got it though, correct? [A:] No.")].

Even more, Plaintiff used Prudential's portal to request more absences during this time. *See* [Doc. 20-2, Nixon Depo., p. 66:2–5 ("[Q:] . . . did you report those by phone or would you report those via the portal somewhere? [A:] Through the portal.")]; *see*

[8] Importantly, Plaintiff does not cite any evidence for this argument. Indeed, his own affidavit does not reference his purported reasons for not returning the medical forms. [Doc. 23-2]. And, his deposition testimony conflicts with the argument that he "never received" the letters and requests. [Doc. 20-2, Nixon Depo., p. 64:5–7 ("[Q:] You don't dispute that you got [the June 28 recertification letter] though, correct? [A:] No.")].

*also, e.g.*, [Doc. 20-9, pp. 5, 7, 9, 11, 13]; [Doc. 20-10, pp. 8, 9, 10, 12, 14]. All of this means that contrary to Plaintiff's argument, he ***did*** receive the requests for recertification—he just decided not to read all of his emails. [Doc. 23, p. 12 n.2]. And, even if it wasn't practicable under the circumstances as he saw it (and the Court doesn't think that's the case), the least Plaintiff needed to do was ask Prudential for more time. He didn't do that, either.[9] By simply asking for recertification based on the up-tick in absences, "there is no evidence that [Anchor Glass's] requests interfered with [Plaintiff's] FMLA rights, or that []he was prejudiced by the recertification request." *Andrews*, 2009 WL 5176462, at *15.

To put a bow on everything handled so far: Prudential properly sought recertification because Plaintiff's requests exceeded his Certification's estimates, and Plaintiff failed to submit the necessary information—and Plaintiff failed to show the request was impracticable under the circumstances.

*b. October 2021 Termination*

Now what? Well, the question becomes whether Anchor Glass's treatment of denied FMLA leave—due to lack of recertification—could give rise to Plaintiff's termination (then eventual re-hire and placement on the LCA)? In short, yes. If a plaintiff fails to recertify within the deadline given, the missed days become non-FMLA

[9] Plaintiff even acknowledged that his failure to "complete the form and get it back to them[,]" led to Prudential denying some of his requested absences. [Doc. 20-2, Nixon Depo., p. 79:15–19].

absences and are subject to an employer's absence policy. *See* 29 C.F.R. § 825.305(d) ("If the employee fails to provide the employer with a complete and sufficient certification . . . or fails to provide any certification, the employer may deny the taking of FMLA leave, in accordance with § 825.313."); *see also Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000). Put another way, a "[f]ailure to meet the certification requirements renders the employee's absences unprotected by the FMLA. If these uncertified, hence unprotected, absences violate an attendance policy, an employer may terminate an employee without violating the FMLA." *Baldwin-Love v. Elec. Data Sys. Corp.*, 307 F. Supp. 2d 1222, 1229 (M.D. Ala. 2004).[10] And, Plaintiff "provides no support for the proposition that an employer must abandon its own fifteen-day deadline for submitting FMLA paperwork by retroactively approving claims supported by paperwork submitted months after that deadline expired." *Priddy v. Moses H. Cone Mem'l Hosp. Operating Corp.*, No. 1:18CV405, 2020 WL 2572285, at *6 (M.D.N.C. May 21, 2020), *aff'd*, 855 F. App'x 166 (4th Cir. 2021).[11]

---

[10] *See also Harrison v. Greater Dayton Reg'l Transit Auth.*, No. 3:10-CV-430, 2012 WL 1987108, at *8 (S.D. Ohio June 4, 2012) ("Based on Harrison's failure to submit a recertification within fifteen days, the RTA delayed the continuation of his FMLA leave until he submitted recertification paperwork. As a result of not timely submitting the requested medical documentation, the RTA categorized these absences as under the Absence Control Policy and not as FMLA leave."); *Graham v. BlueCross BlueShield of Tenn., Inc.*, 521 F. App'x 419, 425 (6th Cir. 2013) ("If an employee fails to provide the requested recertification, the leave is not FMLA leave. Under these circumstances, BCBST was justified in concluding that the absences at issue were not FMLA leave based on Graham's failure to provide the necessary recertification. BCBST could therefore properly count the days after which recertification was necessary in support of Graham's termination."); *Whittington v. Tyson Foods, Inc.*, 21 F.4th 997, 1002 (8th Cir. 2021).

[11] *See also Walthall v. Fulton Cnty. Sch. Dist.*, 18 F. Supp. 2d 1378, 1384 (N.D. Ga. 1998) ("The Act should not be interpreted to give every terminated employee the right to retroactively claim that his or her sick leave

Since Plaintiff failed to recertify—as requested by Prudential—his absences counted as points against him.[12] And, nothing required Anchor Glass to overturn the denied requests following Plaintiff's untimely recertification.[13] *Cf. Watson v. Drexel Univ.*, No. 20-3001, 2021 WL 4429826, at *3 (3d Cir. Sept. 27, 2021); *see also Trautman v. Time Warner Cable Tex., LLC*, No. A-16-CV-1049-LY, 2017 WL 5985573, at *7 (W.D. Tex. Dec. 1, 2017) ("Trautman was in fact granted all the FMLA leave she requested and for which she provided supporting medical documentation. Trautman cannot make out an interference claim based on the failure to retroactively afford her FMLA leave."); *see also*

should be considered FMLA leave, thereby supporting a claim pursuant to the Act's non-discrimination provisions.").

[12] Courts have concluded terminations following a one-day late certification do not violate the FMLA. *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 567 (6th Cir. 2005) ("We find that Frazier's claim fails since he did not submit a certification form by the deadline set by Honda, a deadline which complied with the FMLA.").

[13] To be sure, Gordon doesn't explain his decision to deny Prudential's offer to overturn Plaintiff's unexcused absences following Plaintiff's (untimely) submission of the recertification. However, Gordon isn't required to persuade the Court (or a factfinder) of the rationale behind his decision—so long as his decision is allowed by law (which it is)—unless asked by Plaintiff. *Cf. Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981) (explaining that a defendant bears the burden of *producing* "nondiscriminatory reasons for its actions," not *persuading* that "it was actually motivated by [those] reasons"). And, to be clear, Plaintiff didn't depose Gordon. Sure, he attempted to re-open discovery to depose Gordon, but the Court found that "[i]n the end, Plaintiff knew []Gordon's position with Defendant. Plaintiff sat on his hands until the extended discovery deadline—***that he requested***—passed and then sought to reopen discovery 16 days after the close of the extended discovery period. That is not good cause or excusable neglect." [Doc. 21, p. 7]. Accordingly, the Court denied Plaintiff's Motion to Reopen Discovery [Doc. 15]. Might Plaintiff have been able to get some evidence via Gordon's testimony to change this specific issue? Possibly. But it is too late to relitigate old matters, and Plaintiff is stuck with the evidence (or lack thereof) that he compiled.

Put differently, Anchor Glass—through Gordon—decided to deny Prudential's offer to overturn Plaintiff's absences because "[i]t [was] a fact that [Plaintiff] failed to . . . provide timely supporting documentation to Prudential in order to get multiple days covered under the FMLA program." [Doc. 20-12, p. 13]. That is the same position Anchor Glass takes now. [Doc. 19-1, p. 10].

29 C.F.R. § 825.301(d) ("In all cases where leave *would* qualify for FMLA protections, an employer and an employee ***can*** mutually agree that leave be retroactively designated as FMLA leave.") (emphasis added); *Njaim v. FCA US LLC*, 764 F. App'x 513, 515 (6th Cir. 2019) ("Njaim must prove that he gave this notice *before* his absences because FCA is not required to designate absences as FMLA-covered leave after the fact." (citing 29 C.F.R. § 825.301(d) (explaining that retroactive designation is permissive)). Therefore, Anchor Glass acted within its rights in terminating Plaintiff for accruing too many absences.

*c. Last Chance Agreement and Final Termination*

Following Plaintiff's termination and related grievance, Anchor Glass permitted him to return to work—conditioned on his agreement to the LCA. [Doc. 23-1, ¶¶ 72–75]. As outlined earlier, the LCA "provided that Plaintiff was permitted zero attendance issues during the first six-month period, from November 30, 2021, through May 30, 2022." [*Id.* at ¶ 76]. But that also proved to be just too high an ask for Plaintiff.

The Court revisits some of the facts to more succinctly set the scene: Upon return following the brief termination, Plaintiff "reinstituted" his FMLA leave through Prudential.[14] [*Id.* at ¶ 78]. After receiving that request, Prudential notified Plaintiff that he needed to return a Certification by December 25, 2021. [*Id.* at ¶ 80]. Following receipt of Plaintiff's Certification, Prudential approved Plaintiff's request for an estimated four

[14] Plaintiff argues that Prudential improperly asked Plaintiff to resubmit FMLA paperwork following his start back with Anchor Glass. However, the Court finds that request to be reasonable under the circumstances. *See* 29 U.S.C. § 2613(a), (e).

times per month, for one day at a time, starting on December 15, 2021, and ending on June 15, 2022. [Doc. 20-15, p. 1]. And, like clockwork, Plaintiff again exceeded his estimated absences, so Prudential requested recertification. [*Id.* at p. 4]. This time, Plaintiff complied, and Prudential approved a new estimate of six times per month for 8 hours, ending on October 1, 2022. [Doc. 20-16, p. 1].

Now we're back to the LCA. The LCA explicitly tolled its requirements by excluding "days off of work for FMLA leave, holidays, and vacation." [Doc. 23-1, ¶ 84]. So, the LCA period now expired on June 30, 2022.[15] [*Id.* at ¶ 85]. On May 12, 2022, Plaintiff called out of work at 5:43 a.m., before his 6:00 a.m. shift to care for his wife. [*Id.* at ¶ 86]. Since that 17-minute notice violated the ACP, Anchor Glass suspended Plaintiff pending termination. [*Id.* at ¶ 87]. Following a meeting, Anchor Glass decided not to terminate Plaintiff's employment. [*Id.* at ¶ 88]. But, on June 20, 2022, Plaintiff's truck broke down and he called out at 9:39 p.m. before a 10:00 p.m. shift. [*Id.* at ¶ 89]. The next day, Anchor Glass suspended Plaintiff pending termination for violating the LCA. [*Id.* at ¶ 90]. Eventually Anchor Glass converted the suspension to a termination and ended Plaintiff's employment. [*Id.* at ¶¶ 92–93].

Despite Plaintiff's arguments, his placement on the LCA did not interfere with his FMLA rights. *See Majewski v. Fischi*, 372 F. App'x 300, 306 (3d Cir. 2010)

---

[15] There is some debate over the actual number of days off, so giving Plaintiff the benefit of the doubt, the Court excludes nine days when Plaintiff wasn't scheduled to work. [Doc. 23-1, ¶ 84]. Regardless, it doesn't alter the outcome.

("Furthermore, the proposed last chance agreements did not interfere with, restrain or deny Majewski's exercise of his FMLA rights. The request that Majewski sign a last chance agreement had no impact on his ability to obtain FMLA benefits."). And, "failure to abide by the terms of the [last chance] agreement is a legitimate grounds for terminating an employee [eligible for] FMLA leave." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 432 (S.D.N.Y. 2004); *see also Basso v. Potter*, 596 F. Supp. 2d 324, 337 (D. Conn. 2009).

In the end, Plaintiff fails to show that "he was denied a benefit to which [he] was entitled under the FMLA." *Chavous v. City of Saint Petersburg*, No. 22-10228, 2024 WL 366243, at *1 (11th Cir. Jan. 31, 2024). Therefore, the Court **GRANTS** Anchor Glass's Motion as to Plaintiff's FMLA interference claim.

## II. <u>FMLA Retaliation</u>

To succeed on a retaliation claim in the FMLA context, Plaintiff must demonstrate that Anchor Glass "intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Jones*, 854 F.3d at 1270 (quoting *Strickland*, 239 F.3d at 1207). Simply put, he has to show that Anchor Glass's actions "were motivated by an impermissible retaliatory . . . animus." *Id.*

### *a. McDonnell Douglas Framework*

Without direct evidence,[16] Plaintiff's retaliation claim funnels into the

[16] Plaintiff does not offer direct evidence of discrimination.

circumstantial-evidence route and an analysis under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Jones*, 854 F.3d at 1271 (citing *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010)). While there are countless cases within and outside the Eleventh Circuit that lay out this burden-shifting framework, the Court need not look any further than the Eleventh Circuit's opinion in *Jones* to discern the applicable law. *Jones* states that "[u]nder the *McDonnell Douglas* framework," Plaintiff "must first establish a prima facie case[.]" 854 F.3d at 1271. Prima facie cases for workplace retaliation are generally created when an employee engages in statutorily protected activity, suffers an adverse employment decision, and can demonstrate that the adverse employment decision was causally related to the protected activity. *Id.* (quoting *Schaaf*, 602 F.3d at 1243); *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).

If Plaintiff establishes a prima facie case, there is an automatic presumption that Anchor Glass's adverse employment decision was the product of its intent to unlawfully retaliate against him. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)) ("Establishment of the prima facie case in effect creates a presumption that the employer unlawfully [retaliated] against the employee."). At that point, the burden shifts to Anchor Glass to "articulate a legitimate, nondiscriminatory reason" for

Plaintiff's termination. *Jones*, 854 F.3d at 1271 (citing *Schaaf*, 602 F.3d at 1243). Finally, if Anchor Glass can meet this burden, then the burden bounces back to Plaintiff who must show that Anchor Glass's supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination. *Jones*, 854 F.3d at 1271 (citing *Schaaf*, 602 F.3d at 1244).

On to the first burden: Can Plaintiff establish his prima facie case? Plaintiff hits an initial bump at the first element—whether he participated in protected activity. Plaintiff contends that he engaged in statutorily protected activity when "he [took] FMLA leave between June 27, 2021 and August 29, 2021." [Doc. 1, ¶ 122]. However, as outlined above, since Plaintiff failed to recertify within Prudential's designated timeframe, his absences ***did not*** count as FMLA leave. *See Cash*, 231 F.3d at 1307; *see also Cronk v. Dolgencorp, LLC*, No. 16-11616, 2017 WL 2225108, at *12 (E.D. Mich. May 22, 2017).[17] Therefore, Plaintiff did not participate in protected activity in advance of his October 2021 termination. Accordingly, Plaintiff cannot state a retaliation claim based on the October 2021 termination.[18]

Plaintiff did, though, participate in protected activity before his eventual

[17] Plaintiff argues that "he would not have accrued those points or been suspended or terminated *had Defendant approved fourteen of those days for the FMLA leave Nixon requested*." [Doc. 23, p. 18]. However, as discussed at length above, Plaintiff didn't return the required recertification forms, and that failure belongs to Plaintiff. He alone is responsible for Anchor Glass denying his FMLA requests.

[18] To the extent Plaintiff argues that Gordon's decision not to overturn Prudential's denial of Plaintiff's FMLA requests is an additional basis for his retaliation claim, he offers no proof that retaliation motivated Gordon's decision. Even more, Plaintiff admitted that his terminated resulted from his failure to provide timely medical documents. *See* [Doc. 20-2, Nixon Depo., p. 90:1–7]; *see also supra* n.13.

termination in 2022.[19] That means Plaintiff must show a causal connection between his protected activity and the adverse employment action. *See Gogel*, 967 F.3d at 1135. Plaintiff's Response doesn't clearly argue causation—sure, he uses the keywords, but that's about it. *See, e.g.*, [Doc. 23, p. 19 ("The Court should find that all of the conduct Nixon claims [sic] was retaliatory was clearly and causally connected to Nixon's use of FMLA leave.")]; [*id.* at p. 18 ("It is also clear that the aforementioned adverse actions were causally related to Nixon's requests and use of FMLA leave.")]. Regardless, the Court examines causation under the theory that Anchor Glass concedes is most relevant—temporal proximity. [Doc. 26, p. 9].

"Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" *Hulbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). Importantly, though, intervening misconduct can sever the inference of causation created by temporal proximity. *Carlisle v. Rhodes & Rhodes Fam. Dentistry*, No. 22-13901, 2024 WL 621421, at *5 n.8 (11th Cir. Feb. 14, 2024). And, that is exactly the case here. The evidence shows Plaintiff's termination in 2022 resulted from his violation of the LCA—not some deep-harbored animus Anchor Glass felt toward Plaintiff for exercising his FMLA rights. *Cf. Henderson v. FedEx Express*, 442

[19] As to the second element of Plaintiff's prima facie case, Plaintiff certainly experienced an adverse employment action via his terminations.

F. App'x 502, 506 (11th Cir. 2011). Therefore, Plaintiff's violation of the LCA broke any temporal proximity and without that, Plaintiff offers no evidence of causation linking his termination to his use to FMLA leave. In short, Plaintiff cannot establish a prima facie case of FMLA retaliation.

Assuming, *arguendo*, the Court got it wrong and Plaintiff did establish a prima facie case, the burden now shifts to Anchor Glass to provide a "legitimate, non-retaliatory reason for" taking adverse actions against Plaintiff. *Gogel*, 967 F.3d at 1136. Anchor Glass easily satisfies this burden of production. As outlined throughout this Order, Anchor Glass acted within its rights in denying Plaintiff's FMLA leave due to his lack of recertification, which led to the October 2021 termination. And, Anchor Glass offered a legitimate, non-retaliatory reason for Plaintiff's final termination—he violated the LCA. *See* [Doc. 26, p. 10].

That means the burden shifts back to Plaintiff to show these proffered reasons are "merely a pretext to mask its real reason"—retaliation. *Gogel*, 967 F.3d at 1136. Notably, to carry the day on a pretext argument, Plaintiff must prove "*both* that the reason was false, *and* that [retaliation] was the real reason." *Id.* (citing *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)).[20]

[20] Plaintiff may not rely on temporal proximity alone for this stage of the burden-shifting framework because "[a] close temporal proximity between the alleged retaliatory acts and the protected activity is evidence of pretext, but insufficient by itself to establish pretext." *McQueen v. Ala. Dep't of Transp.*, 769 F. App'x 816, 824 (11th Cir. 2019) (citing *Hulbert*, 439 F.3d at 1298).

Plaintiff oddly contends that he "does not need to persuade the Court that Defendant proffered explanations are unworthy of credence." [Doc. 23, p. 20]. As he sees it, "Defendant admitted that it took these adverse actions against [Plaintiff] for reasons that were directly related to [his] use of, or attempt to use, FMLA leave." [*Id.*]. Going further, Plaintiff insists:

> Based on [Anchor Glass's] own explanation, a reasonable jury could find that [Anchor Glass] suspended and terminated [Plaintiff's] employment in October and November 2021 because [he] engaged in activities protected under the FMLA. A reasonable jury could find that [Anchor Glass] only allowed [Plaintiff] to be reinstated into his position under a LCA after and because he engaged in protected activities under the FMLA. A finder of fact would also likely find that it was [Plaintiff's] participation in such protected activities under the FMLA that resulted in the suspension and termination of his employment in June and July 2022.

[*Id.*]. But that just isn't how this works. Such an argument fails to point out any ***evidence*** of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Anchor Glass's proffered reasons, such that "a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136; *see also Russell v. City of Tampa, Fla.*, 737 F. App'x 922, 924 (11th Cir. 2018) ("Instead, a plaintiff must produce *evidence* that reveals "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."). Effectively, Plaintiff wants the Court to look back and consider the evidence he presented at the prima facie phase and recycle it to infer pretext. However, a "plaintiff may not . . . merely rest on

the laurels of [his] prima facie case in the face of powerful justification evidence offered by the defendant." *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987). Instead, the plaintiff must "meet [the proffered reason] head on and rebut it." *Wilson v. B/E Aerospace*, 376 F.3d 1079, 1088 (11th Cir. 2004). Plaintiff simply asks this Court to accept his "conclusory allegations," which are "insufficient to establish pretext." *Russell*, 737 F. App'x at 924; *see also Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 886 (11th Cir. 2016) ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of fact as to pretext, the defendant employer is entitled to summary judgment.") (citing *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1291 (11th Cir. 2005)).

Even worse, Plaintiff's own testimony admits that his violation of the LCA caused his suspension and eventual termination. [Doc. 20-2, Nixon Depo., p. 119:10–12]. That places Plaintiff's case close *to Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1338 (11th Cir. 2021), where the Eleventh Circuit concluded that the plaintiff "failed to prove that the [defendant's] proffered reasons were pretextual" after she "admitted to her attendance issues and never challenged her tardiness reports or sick-leave reviews." Indeed, Plaintiff never argued that Anchor Glass treated other employees (who weren't taking FMLA leave) better than it treated him, or that Gordon acted more leniently to non-FMLA covered employees. In truth, Anchor Glass "was not required to exhibit more patience than the law and its own rules required." *Townsend-Taylor v. Ameritech Servs., Inc.*, 523 F.3d 815, 819 (7th Cir. 2008) (affirming a termination after a plaintiff

missed the certification deadline by one day). Undoubtedly, Anchor Glass displayed Job-like patience over the years with Plaintiff and his attendance issues, but at some point, an employer is allowed to expect their employees to follow the law, company policy, and frankly, to show up to work when scheduled. Absent evidence to call those actions into question, that is not retaliation.

*b. Convincing Mosaic*

The Court's application of the Eleventh Circuit's binding precedent severing Plaintiff's FMLA retaliation claim at the prima-facie stage does not foreclose the claim altogether. The burden-shifting framework from *McDonnell Douglas* "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment . . . case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). The Court is, of course, referring to the convincing mosaic scheme which allows Plaintiff to survive summary judgment if he presents circumstantial evidence such that a jury could infer intentional discrimination. *Id.* "A triable issue of fact exists if the record, viewed in a light most favorable to [an employee], presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the [decision maker]." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022). Convincing mosaics may be shown through evidence demonstrating, *inter alia*, "suspicious timing, ambiguous statements, [as well as] other bits and pieces" of the record from which discriminatory intent may be inferred. *Id.*; *see also Lewis*, 934 F.3d at

1185. Also, employees may rely on "systematically better treatment of similarly situated employees[]" and evidence that the employer's justification for an adverse employment decision was pretextual. *Jenkins*, 26 F.4th at 1250.

However, as the Court already made clear, Plaintiff failed to "present a story, *supported by evidence*, that would allow a reasonable jury to find that the employer engaged in unlawful retaliation against the employee." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023) (emphasis added). Plaintiff's theory rests solely on speculation that Anchor Glass retaliated against him because of his FMLA leave. But "inferences in favor of [an employee] can be based only on *evidence*—not on *speculation*." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020) (emphasis added). Accordingly, the Court **GRANTS** Anchor Glass's Motion as to Plaintiff's FMLA retaliation claim.

## CONCLUSION

There is no dispute that Anchor Glass took a rigid, strict approach in applying its attendance policies and the FMLA's regulations to Plaintiff's situation following his disregard of the recertification requests. However, a strict application of the law and company policy does not automatically create a claim of interference or retaliation. Instead, to support such a theory, Plaintiff needed to show that Anchor Glass "departed from its standard procedure,"[21] or it "treated similarly situated employees differently—

[21] *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1108 (11th Cir. 2001).

*i.e.*, by showing that valid 'comparators' were treated differently than [P]laintiff."[22] *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1326 (11th Cir. 2020).[23] Plaintiff offered no evidence to that effect. In truth, Plaintiff offered no real evidence of substance at all.

In the end, Plaintiff failed to carry his burden to produce evidence showing Anchor Glass "denied him a benefit to which he was entitled under the FMLA," because he didn't follow the procedures outlined under the statute. *Bartels v. S. Motors of Savannah, Inc.*, 681 F. App'x 834, 840 (11th Cir. 2017). Likewise, Plaintiff "has not presented any evidence that retaliation for his FMLA leave was the real reason behind his termination." *Salem v. City of Port St. Lucie*, 788 F. App'x 692, 697 (11th Cir. 2019). Therefore, the Court **GRANTS** Anchor Glass's Motion for Summary Judgment [Doc. 19] and **DIRECTS** the Clerk of Court to **ENTER** Judgment and **CLOSE** this case.

**SO ORDERED**, this 6th day of December, 2024.

S/ *Tilman E. Self, III*
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[22] In Plaintiff's defense, he attempted to make such an argument by contending that "[u]nlike other employees, who are given a variety of warnings for unexcused absences before being subject to disciplinary action, Defendant placed Nixon on 'Zero Tolerance Probation,' meaning that he could have no absences for, at least, six months, and only a limited number of attendance occurrences for the following year." [Doc. 23, p. 13 (citing [Doc. 19-2, ¶¶ 4-6])]. However, the cited material only references Anchor Glass's generic attendance policy—not ***evidence*** of other employees actually being treated differently. But, the Court recalls that Defendant had given Plaintiff "a variety of warnings" about his attendance issues and clearly gave him multiple chances before it finally terminated him.

[23] *See also Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) ("An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.").